UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CONSUMER DATA INDUSTRY ASSOCIATION, | ) ) ) |
| PLAINTIFF, | ) ) |
| v. | ) Civil File No. 07-CV-3376 DSD/JJG ) |
| LORI SWANSON, in her official capacity As Attorney General of the State of Minnesota, | ) ) ) |
| DEFENDANT. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF APPLICATION FOR
<u>TEMPORARY RESTRAINING ORDER</u>**

Plaintiff Consumer Data Industry Association ("CDIA") seeks a temporary restraining order and/or a preliminary injunction to prevent the enforcement of a new law, Minn. Stat. § 13C.01, subd. 3, which will otherwise become effective on August 1, 2007. Although the full scope of conduct proscribed by the new law is unclear, at a minimum it clearly prohibits consumer reporting agencies from selling what is commonly known as "prescreening" information, even though the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 et seq., expressly <u>permits</u> the sale of that same information and <u>precludes</u> state regulation of any kind concerning that subject. The new state law should be enjoined because it is preempted by federal law and it violates the First Amendment rights of Plaintiff CDIA's members. As demonstrated below, CDIA and its members are entitled to this relief because they have no adequate remedy at law and will be irreparably harmed if they are forced to incur the significant loss of sales, administrative burdens, and impairment of free speech rights, necessitated by any attempt to comply with the new

law.  Moreover, respect for federal law and the public interest strongly weigh in favor of granting a temporary restraining order to maintain the status quo until this Court can fully address the merits of the case.

## FACTS

Parties

CDIA is an international trade association founded in 1906. Affidavit of Eric Ellman, ¶1.  Its membership includes more than 500 consumer credit and other specialized consumer reporting agencies operating in the United States and throughout the world. Id.  As part of its mission to support companies offering consumer information reporting services, CDIA assists its members in dealing with business and legal issues confronting the industry and represents and protects the interests of its members in legislative matters. Id.  The interests that CDIA seeks to protect in this action are central to CDIA's mission.

The Attorney General for the State of Minnesota is charged with enforcing the new law. *See* Minn. Stat. § 13C.04.  Representatives of CDIA met with the Attorney General's Office staff during this year's legislative session regarding interpretation and enforcement of the statute.  Id. at ¶4.  During those discussions,  CDIA's representatives communicated their concerns about the new law to the Attorney General's office, including that, if the new law were enacted, it would be preempted by the Fair Credit Reporting Act ("FCRA"). Id. at ¶5.  The Attorney General's office staff declared that they were indifferent to the industry's concerns, including whether the new law was

preempted. Affidavit of Eric Ellman, ¶6. The Attorney General's staff also indicated that they fully intended to enforce the new law when it became effective. Id. at ¶7.

<u>The FCRA and Prescreened Consumer Reports</u>

The FCRA reflects a careful Congressional balancing of the "needs of commerce" and the "efficiency of the banking system" with the need to protect the privacy interests consumers may have in the information about them that is furnished by consumer reporting agencies. *See* 15 U.S.C. § 1681. As part of this balancing of interests, the FCRA prohibits consumer reporting agencies from furnishing consumer report information except for specifically identified "permissible purposes." 15 U.S.C. § 1681b. The "prescreening" of consumer reports in connection with firm offers of credit is one of the permissible purposes enumerated by the FCRA. *See* 15 U.S.C. §§ 1681b(c). Moreover, the FCRA preempts state regulation of certain subjects governed by the FCRA, including "prescreening." 15 U.S.C. § 1681t(b), (b)(1)(A).

"Prescreening" is the process by which a "prescreened consumer report" is provided to creditors who specify to the consumer reporting agency criteria to select the "prescreened" consumers. Declaration of Patricia Finneran, ¶3; Declaration of Richard G. Goerss, ¶3; Declaration of McCawley, ¶3. The creditors must certify to the consumer reporting agencies that they will extend a "firm offer of credit" to consumers who satisfy the selection criteria and creditworthiness standards. Id. For example, mortgage lenders and brokers may wish to extend a firm offer of credit to consumers seeking a mortgage loan. Id. Home improvement centers or appliance stores may wish to offer a preapproved credit card to consumers who have recently purchased homes. Goerss Decl., ¶3;

McCawley Decl., ¶3.   These creditors can set selection criteria so that they receive the names of prescreened consumers who are most likely to be in the market for a mortgage loan or most likely to respond to a credit offer from a home improvement or appliance center. Goerss Decl, ¶4.; Finneran Decl, ¶4; McCawley Decl, ¶4.

The new law focuses on one of the selection criteria used for "prescreened" reports -- namely, whether a mortgage lender has recently made an inquiry about the consumer.  The type of prescreened consumer report generated with this type of selection criterion has been referred to as a "trigger lead," Finneran Decl, ¶¶4-5; Goerss Decl, ¶4, or "mortgage trigger." McCawley Decl, ¶4.   The prescreening criteria will essentially "trigger" the inclusion of a consumer on a prescreened list that the consumer reporting agency furnishers to the user. Finneran Decl, ¶¶4-5; Goerss Decl, ¶4.

The FCRA gives consumers the right to opt out of receiving prescreened offers. *See* 15 U.S.C. § 1681b(e) (requiring nationwide consumer reporting agencies, who are all members of CDIA, to establish and maintain a joint notification system, including a toll-free telephone number, that a consumer may use to opt out).   After a consumer "opts out," of prescreening, the consumer reporting agency must exclude that consumer from prescreened reports, even if the consumer otherwise matches all of the user's selection criteria. *Id.* §§ 1681b(c)(1)(B)(iii), (e)(1), (l)(1)(B)(iii).   The FCRA also requires any consumer report user who makes a written firm offer of credit to a consumer whose name and address is obtained through prescreening to inform the consumer of the right "to prohibit information contained in the consumer's file with any consumer reporting

agency from being used in connection with any credit or insurance transaction that is not initiated by the consumer...."  15 U.S.C. § 1681m(d)(1)(D).

In granting consumer reporting agencies the ability to furnish, and consumer report users to obtain, prescreened consumer report information even when the consumer has not initiated the transaction, Congress expressly "balance[d] any privacy concerns created by pre-screening with the benefit of a firm offer of credit or insurance for all consumers identified through the screening process."  *See* S. Rep. No. 209, 103rd Cong., 1st Sess. 1993 WL 516162, at *13 (Dec. 9, 1993).  To protect consumer privacy interests, the FCRA limits the information that consumer reporting agencies may furnish in a prescreened report.  The agency may provide only the consumer's name and address, a non-unique identifier, and other information that does not identify the relationship or experience of the consumer with respect to a particular creditor or other entity.  15 U.S.C. § 1681b(c)(2).  Finally, "in exchange for allowing credit and insurance providers to obtain [prescreened] lists ... the bill requires that the credit or insurance provider make a 'firm offer,' ... of credit or insurance to all consumers on the list."  S. Rep. No. 209, 103rd Cong., 1st Sess. 1993 WL 516162, at *14; 15 U.S.C. § 1681b(c)(1)(B)(iii) (consumer report user who obtains this limited information must make a "firm offer of credit or insurance" to the consumer).

Effect Of The New Minnesota Law

Given that the FCRA expressly permits, and states are prohibited from regulating, "prescreened" reports, CDIA's member consumer reporting agencies have developed efficient, nation-wide business operations, without any variation in state law,  to offer this

federally-approved product. Finneran Decl, ¶¶5-6; Goerss Decl., ¶¶5-6; McCawley Decl,

¶¶5-6.   However, their rights to sell such reports under the FCRA and the First

Amendment are threatened by the imminent enforcement of a recently-passed law in

Minnesota.   Minn. Stat. § 13C.01, subd. 3, which takes effect on August 1, 2007,

provides in relevant part:

> *A consumer reporting agency* or any other business entity *may not sell to*,
> or exchange with, *a third party*, unless the third party holds an existing
> mortgage loan on the property, *the existence of a credit inquiry arising
> from a consumer mortgage loan application when the sale or exchange is
> triggered by an inquiry made in response to an application for credit*…

(Emphasis added).

The extent to which the newly enacted Minn. Stat. § 13C.01, subd. 3, will sweep is

unclear.  However, it is clear that, at the very least, CDIA's members will be absolutely

prohibited from providing prescreened consumer reports based on mortgage trigger leads.

In addition, it is possible that the new law could be read by some to prohibit consumer

reporting agencies from including the record of the inquiry resulting from a mortgage

loan application in any consumer report that is provided to any creditor in connection

with a consumer's application for any kind of credit.

Compliance with Minn. Stat. § 13C.01, subd. 3 will cause substantial economic

losses that cannot be recouped by consumer reporting agencies, including lost sales and

administrative costs and burdens.  For example, CDIA members could face multi-million

dollar costs to fully comply with all aspects of the law as it may be interpreted. Finneran

Decl., ¶9.  They will certainly lose revenue as a result of not being able to sell certain

types of consumer reports to users, who purchase them in order to make offers to

consumers.  These so-called "trigger lead" products are useful only during the window of time that a consumer is in the market for a mortgage product. Finneran Decl, ¶10; Goerss Decl., ¶10; McCawley Decl, ¶10.  In addition, when a consumer responds to a prescreened offer based on a mortgage trigger, the lender or broker often obtains a full consumer report which is sold by consumer reporting agencies.  CDIA members will lose the revenues from selling these reports as well. Goerss Decl., ¶10.  Consumers in Minnesota will lose the option to receive preapproved firm offers from creditors who might extend more favorable credit. Goerss Decl., ¶13.

In addition, if the new law is interpreted to prohibit consumer reporting agencies from furnishing any consumer report that includes a mortgage lender or broker inquiry, consumer reporting agencies may not be able to report some inquiries in consumer reports involving Minnesota residents.  This would cause the omission of important and relevant information in such reports. Goerss Decl, ¶11; McCawley Decl, ¶11.  Consumer reports for Minnesotans would become less reliable and predictive. Id.; Finneran Decl., ¶12.  As a result, creditors may purchase fewer consumer reports on Minnesota consumers, and creditors may become less likely to extend credit to marginal applicants from Minnesota – a result that would hurt both Minnesota consumers and creditors. Goerss Decl, ¶12; Finneran Decl, ¶12; McCawley Decl, ¶12.  Some consumer reporting agencies may decide to simply quit selling all consumer reports relating to consumers residing in Minnesota, resulting in millions of dollars of lost revenue, and making it more difficult and more costly for Minnesota consumers to obtain credit. Finneran Decl, ¶11.

## ARGUMENT

The procedures for issuance of injunctive relief are set forth in Rule 65 of the Federal Rules of Civil Procedure.  The Eighth Circuit has identified four factors that should be considered in determining whether to grant the requested relief:

1.    The threat of irreparable harm to the moving party if an injunction is not granted:

2.    The harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted;

3.    The probability that the moving party will succeed on the merits; and

4.    The public interest.

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113-14 (8th Cir. 1981).[1]

A temporary restraining order is typically sought and issued on an emergency hearing basis and operates to prevent irreparable harm until a hearing can be conducted to determine the need for a preliminary injunction.  *Id.* at 113-14.  Given the summary nature of a temporary restraining order proceeding, the trial judge is not expected to be able to apply the factors with the same degree of scrutiny as compared to a full hearing for a preliminary injunction.  Rather, the court is concerned primarily with the need to maintain the status quo for the short period until the preliminary injunction hearing, at which time the matter can be briefed and presented by the parties more fully and carefully considered by the court. Consequently, the inquiry typically centers on the balance of hardships and the probable irreparable harm that might result if the TRO is

---

[1]  These same factors are also considered in connection with issuance of a temporary restraining order. *Wells Fargo Investments, LLC v. Bengtson*, Case No. 07-3192 (MJD/AJB), 2007 WL 2007997 (D. Minn. July 9, 2007).

granted or denied. *See, e.g., Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 742-43 (7th Cir. 1976); *Onan Corp. v. United States*, 476 F. Supp. 428, 433 (D. Minn. 1979).

Here, CDIA readily satisfies this standard for each of the four elements set forth in *Dataphase*, including the element of immediate and irreparable injury. No harm will result from briefly delaying the effective date of the new legislation until the Court can consider the clear federal preemption and constitutional infringements caused by the law.

## I.    Irreparable Harm Will Result If the TRO Is Not Granted.

CDIA's members will suffer immediate and irreparable harm if they are forced to comply, even temporarily, with a state law that is preempted and unconstitutional. Attempted compliance by CDIA and its members will undoubtedly result in unrecoverable economic harm including loss of sales and significant administrative costs and burdens, as well as halt the exchange of constitutionally-protected free speech. Finneran Decl, ¶¶9-14; Goerss Decl., ¶¶8-14 McCawley Decl, ¶¶8-14. As explained below, these harms weigh heavily in favor of granting injunctive relief.

The Eighth Circuit recognizes the threat of unrecoverable economic loss as a factor supporting entry of temporary injunctive relief. *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). Here, CDIA's members could not recover any loss of sales revenue and increased administrative expenses, as the defendant is immune from liability for these monetary damages under the Eleventh Amendment. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03 (1984) ("[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may … not … award[] retroactive

monetary relief").   Since CDIA's members cannot recover expenditures made in an attempt to comply with this invalid state law, they will suffer irreparable harm.   *See Kansas Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1556, 1563-64 (D. Kan. 1993) (Eleventh Amendment bar to recovery evidences irreparable harm).   Beyond these economic damages, the potential loss of customer goodwill and the unrecoverable expenditures that CDIA and its members will be forced to make constitute irreparable harm justifying entry of a temporary restraining order against the Minnesota Attorney General.   *See Cellco v. Hatch*, No. 04-2981 (JRT/FLN), 2004 WL 1447914 (D. Minn. June 29, 2004) (Tunheim, J.), *aff'd*, 431 F.3d 1077 (8th Cir. 2005).

In *Cellco*, Judge Tunheim granted a TRO preventing the Attorney General and any officers or employees of the State of Minnesota from taking action to enforce provisions of a new statute signed into law during that year's legislative session and scheduled to go into effect three days after the order, given the significant federal preemption issues presented in the complaint and irreparable harm to wireless carriers in attempting compliance with law.   While the district court later denied the plaintiffs' motion for a preliminary injunction, concluding the state law was not preempted, the Eighth Circuit Court of Appeals reversed that decision, effectively reinstating the district court's original conclusion on the TRO motion.   Had the district court denied the wireless carriers' TRO motion, they would have suffered irreparable harm by the time the Eighth Circuit considered the issues.   This illustrates the importance of granting emergency relief in the form of a TRO in the present circumstances, where irreparable harm is identified and

there significant questions exist as to whether the state law is preempted or unconstitutional.

Finally, but perhaps most importantly, the constitutional defect in the Minnesota statute constitutes irreparable harm even aside from the unrecoverable economic damages. *Entertainment Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065 (D. Minn. 2006) (Rosenbaum, C.J.); *see also Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion)).   Any infringement of First Amendment rights includes a chilling effect, whereby others may be "deterred, even if imperceptibly, from exercising those rights in the future." *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998) (citations omitted).

## II.   Balance of Harm Favors Granting Injunctive Relief

The Eighth Circuit has previously noted that an injunction of preempted state law by its nature serves the public interest.  In such cases, courts need not even consider the factors of balance of harms to the parties and the competing public interests, because those matters are necessarily accounted for by definitively proving a state law to be in violation of the Supremacy Clause of the Constitution. *Bank One, N.A. v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999).  As explained above, CDIA has shown irreparable harm, as well as a likelihood of success and thus does not need to show the remaining two

prongs of balance of harm and public interest.  However, these factors also weigh heavily in favor of granting injunctive relief in this case.

The harm to CDIA, its members and their customers, and the public, that may result if injunctive relief is not granted far outweighs any inconvenience to the Attorney General, who merely seeks to impose new burdens on the credit reporting industry that are expressly preempted under federal law.  CDIA seeks only to maintain the status quo and thus prevent any unnecessary and costly compliance efforts and lost sales until this Court can resolve the substantial federal questions presented by the Complaint.  *See Marigold Foods, Inc. v. Redalen*, 834 F. Supp. 1163, 1170 (D. Minn. 1993) (granting preliminary injunctive relief from state regulation to "maintain the status quo until the constitutionality of the Minnesota law can be resolved").

As detailed above, CDIA's members will suffer irreparable harm should this Court fail to grant injunctive relief.  *See supra* § III.  In addition, the Minnesota law actually harms Minnesota consumers who want to receive competing firm offers of credit, but who will not because the new Minnesota law prohibits furnishing reports that include the content that would lead to such an offer.  Therefore, the harm absent injunctive relief weighs in favor of granting injunctive relief.

On the other hand, the grant of relief will not cause any comparable harm. Although it is anticipated that the Attorney General will argue the interests of consumers may be harmed through injunctive relief, in fact, no Minnesota consumers will be harmed because each Minnesota consumer has the right to opt out of the prescreening process under the FCRA. 15 U.S.C. § 1681b(c)(1)(B)(iii).  When a consumer opts out, consumer

reporting agencies cannot furnish the consumer's name and address to any user who requests prescreened information (including the so-called "mortgage trigger" leads). Thus, no harm comes as a result of granting injunctive relief.

As a result of the harm to CDIA's members in the absence of injunctive relief, and the lack of harm to the State if such relief is granted, the scale of the equities weighs firmly in favor of granting a temporary restraining order.

### III.    Public Policy Favors Granting Injunctive Relief.

Public policy also favors the issuance of injunctive relief in this matter.   In weighing public policy considerations, the court must consider the "strong public interest in deferring to the will of Congress," including its intent to preempt state law. *Cellco*, 2004 WL 1447914, at *4.  As one federal court noted, "it cannot be said an injunction that compels compliance with [a federal statute] – a congressional mandate, the classic expression of the 'public interest' in a democracy – could *disserve* the public interest." *Illinois Hosp. Ass'n v. Ill. Dep't of Pub. Aid*, 576 F. Supp. 360, 371 (N.D. Ill. 1983) (emphasis in original)

Here, the text of the FCRA reflects a careful Congressional balancing of the "needs of commerce" and the "efficiency of the banking system" with the need to protect the privacy interests consumers may have in the consumer report information about them that is furnished by consumer reporting agencies. *See* 15 U.S.C. § 1681.  As part of balancing these interests, the FCRA preempts state regulation of certain subjects governed by the FCRA, including the sale of prescreened consumer reports. 15 U.S.C. § 1681t(b).   The Minnesota law contradicts the explicit text of the FCRA and

Congressional policy behind it by seeking to regulate prescreened consumer reports. Since the public interest in enforcing federal law stands threatened in the face of the enforcement of Minnesota Statute, this factor weighs in favor of granting injunctive relief.

Lastly, if enforcement of the Minnesota Statute is not enjoined, its vague terms and attendant scope of prohibited conduct will unduly interrupt national commerce. The new law, if read broadly to preclude the inclusion of any inquiry information on reports for Minnesota consumers, would be detrimental to the public interest because the reports would be less reliable, and credit scores developed without the information would be less predictive. An inquiry on a consumer's credit report is a statistically reliable and predictive factor in the development of credit scores. Finneran Decl, ¶12. If an inquiry is not recorded or included in a consumer report, credit scores calculated without the inquiry will be less predictive and therefore less useful in accurately evaluating consumer's creditworthiness. Id. Creditors will be less likely to extend credit to marginal applicants – a result that will harm consumers, as well as creditors. Id. Such harm would be directly attributable to the new law. Although perhaps an unintended consequence of the new law, consumer reporting agencies must consider taking an overly broad compliance approach in order to avert an enforcement action by the Attorney General.

## IV.    CDIA Will Likely Succeed on the Merits.

A movant demonstrates likelihood of success on the merits when a movant demonstrates support for its position in governing law. *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405, 1424 (N.D. Iowa 1996). However, a court need not

determine whether the movant will ultimately win.  *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991).  Rather, the likelihood of success merely requires that the movant find support for its position in governing law.  *Uncle B's Bakery*, 920 F. Supp. at 1424.  Here, CDIA has ample support for its position that the new law is preempted by the FCRA and is otherwise unconstitutional.

      1.     <u>The new state law is preempted by the FCRA.</u>

Because Minn. Stat. § 13C.01, subd. 3 prohibits consumer reporting agencies from providing certain prescreened consumer report information to users it is preempted by the FCRA's subject matter preemption provisions.  Specifically, 15 U.S.C. § 1681t(b)(1)(A) provides as follows:

> No requirement or prohibition may be imposed under the laws of any state:
>
> (1) ***with respect to any subject matter*** regulated under (A) subsection (c) or (e) of section 1681b of this title, ***relating to the prescreening of consumer reports*** ....

(Emphasis added).

The legislative history to the FCRA's 1996 amendments makes clear that, read together, 15 U.S.C. §§ 1681t(b)(1)(A) and 1681t(c) were intended to preclude any kind of state regulation of prescreening, regardless of how a State would describe or define the regulated subject matter:

> Section 624 [now 15 U.S.C. § 1681t] provides that certain provisions of the FCRA preempt any corresponding provisions of state law. More specifically, ***under section [1681t], no state or local authority may impose any requirement, prohibition or other provision with respect to any subject matter regulated under Section 604(c) or (e) [1681b] relating to prescreening***. Section 604(c) and (e) [1681b], among other things, provide that a consumer reporting agency may furnish prescreened lists in connection with a firm offer of credit or insurance, provided that the

consumer reporting agency has established the opt-out notification system required under section 604 [1681b] and the consumer has not opted out. Section 604 [1681b] also specifies the information that a consumer reporting agency may furnish on a prescreened list. Section 624 [1681t] also preempts any state or local provision relating to the definition of "firm offer of credit or insurance" set forth in the Act. *In short, under section 624 [1681t], any state or local authority is precluded from employing or establishing any provisions relating to any aspect of prescreening*.

S.Rep. No. 185 at 59-60, 104th Cong., 1st Sess. (Dec. 14, 1995), 1995 WL 747809 (emphasis added); *see also, Jewett v. Capital One Bank*, 2006 WL 1085895 *2 (Cal. Ct. App. 2006) ("Because Congress has established a pervasive regulatory scheme governing 'firm offers of credit,' *it has expressly preempted any state regulation of the subject*.") (emphasis added).

In direct contravention of the FCRA, the new state law would clearly prohibit the furnishing of prescreened consumer report information if one of the selection criteria identified by the user included whether there was an inquiry from a mortgage lender. The new Minnesota law provides:

> *A consumer reporting agency* or any other business entity *may not sell to*, or exchange with, *a third party*, unless the third party holds an existing mortgage loan on the property, *the existence of a credit inquiry arising from a consumer mortgage loan application when the sale or exchange is triggered by an inquiry made in response to an application for credit*…

Minn. Stat. § 13C.01, subd. 3 (emphasis added).

In addition to prohibiting consumer reporting agencies from furnishing prescreened consumer report information in certain circumstances, Minn. Stat. § 13C.01, subd. 3 might possibly be interpreted by the Minnesota Attorney General as an attempt to also regulate the content of consumer reports by prohibiting consumer reporting agencies

from including the record of an inquiry resulting from a mortgage loan application in a consumer report that is provided to any creditor who has requested a consumer report in connection with a consumer's application for credit. Under such an interpretation, the Minnesota law is also preempted by the FCRA's subject matter preemption provisions.

15 U.S.C. § 1681t(b)(1)(E) provides, in relevant part, that:

> No requirement or prohibition may be imposed under the laws of any State … with respect to any subject matter regulated under … section 1681c of this title, relating to information contained in consumer reports, except that this subparagraph shall not apply to any State law in effect on September 30, 1996….

(emphasis added). 15 U.S.C.§ 1681c regulates the content of consumer reports provided by consumer reporting agencies and describes the information that consumer reporting agencies are prohibited from including in any consumer report. Section 1681c, which specifies the information that a consumer report may not contain, says nothing about omitting information relating to a particular type of credit inquiry from a consumer report. By requiring that the existence of certain credit inquiries be omitted from any consumer report furnished to a user who has requested the report in response to a consumer's application for credit, Minn. Stat. § 13C.01, subd. 3 would be an improper attempt to regulate subject matter (i.e., the report content), in disregard of the FCRA.

2.    The new state law is unconstitutional

Minn. Stat. § 13C.01, subd. 3 prohibits consumer reporting agencies from reporting truthful, accurate and non-misleading information relating to a consumer's application for certain types of credit. As such, it is a content-based restriction that seeks to prohibit the free expression that is protected by the First Amendment to the U.S.

Constitution. *Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 773 (1976) ("What is at issue is whether a State may completely suppress the dissemination of concededly truthful information about entirely lawful activity, fearful of that information's effect upon its disseminators and its recipients. Reserving other questions, we conclude that the answer to this one is in the negative.").

Regardless of whether the constitutionality of Minn. Stat. § 13C.01, subd. 3 is evaluated under the strict scrutiny standard applied to noncommercial speech, or the intermediate scrutiny standard that is applied to commercial speech, the new law cannot survive. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). The *Central Hudson* test applied to restrictions on commercial speech asks: (i) whether the expression is protected by the First Amendment; and (ii) whether the asserted governmental interest is substantial. If the answers to each of these questions is "yes," then the following questions must be considered: (iii) whether the regulation directly advances the governmental interest; and (iv) whether the regulation is more extensive than is necessary to serve the articulated interest. *See, Id.* at 564.

Even assuming that Minn. Stat. § 13C.01, subd. 3 was enacted to promote a "substantial" governmental interest, such as protecting consumer privacy, and that it would "directly advance" that interest; the new law is demonstrably more extensive than is necessary to serve such an interest. Minn. Stat. § 13C.01, subd. 3 completely prohibits a consumer reporting agency from reporting – for any consumer – the existence of a credit inquiry arising from a consumer mortgage loan application when the reporting is

triggered by an inquiry made in response to an application for credit.  If this complete prohibition is intended to protect consumer privacy, it sweeps too broadly.

In balancing consumer privacy interests against the benefit consumers may obtain from the firm offers of credit that result from the prescreening process, the U.S. Congress narrowly tailored the FCRA to permit consumers to protect their own privacy interest while still promoting the "needs of commerce" and the "efficiency of the banking system."  Any consumer may, by notifying the consumer reporting agencies, entirely prohibit the inclusion of his or her consumer report information in any prescreened list furnished by a consumer reporting agency to a user.  Unlike Minn. Stat. § 13C.01, subd. 3, which operates to completely prohibit consumer reporting agencies from furnishing prescreened consumer reports that identify consumers who have recent mortgage inquiries, the FCRA permits all consumers to receive the benefits offered through the firm offers of credit that result from such trigger leads to protect their own privacy on a consumer-by-consumer basis.  Minn. Stat. § 13C.01, subd. 3 is, therefore, demonstrably more extensive than necessary to achieve any governmental interest that might have led to its enactment.

## V.    No Bond Should Be Required.

Although Rule 65 typically requires that a security bond be posted as a condition to temporary injunctive relief, district courts are afforded broad discretion in that determination. *Hill v. Xyquad, Inc*., 939 F.2d 627, 632 (8th Cir. 1991).  There appears to be no purpose for any substantial bond under the circumstances of this case.  Because the claims for declaratory relief will be decided based upon pure legal issues, without

requiring any detailed discovery or credibility determinations, a final decision on the merits may be possible within several months.  Maintenance of the status quo during such a short time would not cause the State of Minnesota or the Office of the Attorney General any apparent damage.   Moreover, as one federal court within the Eighth Circuit has noted, "requiring a bond to issue before enjoining potentially unconstitutional conduct by a governmental entity simply seems inappropriate, because the rights potentially impinged by the governmental entity's actions are of such gravity that protection of those rights should not be contingent upon an ability to pay" *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F. Supp. 2d 1022, 1043-44 (N.D. Iowa. 2004).  If any bond is required, it should be in a nominal amount.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests an order granting its application for a temporary restraining order.

|  |  |
|---|---|
| | **BASSFORD REMELE**<br>*A Professional Association* |
| Dated:  July 17, 2007 | By  s/ Christopher R. Morris<br>    Lewis A. Remele, Jr. (License #90724)<br>    Christopher R. Morris (License #230613)<br>33 South Sixth Street, Suite 3800<br>Minneapolis, Minnesota  55402-3707<br>(612) 333-3000 |
| | Anne P. Fortney<br>James Chareq<br>Lisa C. DeLessio<br>HUDSON COOK, LLP<br>1020 19th Street, NW, 7th Floor<br>Washington, DC 20036<br>(2020 223-6930 |
| | Attorneys for Plaintiff |