UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| CONSUMER DATA INDUSTRY ASSOCIATION, | Case No. 07-CV-3376 (PJS/JJG) |
| Plaintiff, | |
| v. | ORDER |
| LORI SWANSON in her official capacity as Attorney General of the State of Minnesota, | |
| Defendant. | |

A. James Chareq, HUDSON COOK, LLP; Lewis A. Remele, Jr., and Christopher R. Morris, BASSFORD REMELE, PA, for plaintiff.

Thomas C. Vasaly, MINNESOTA ATTORNEY GENERAL'S OFFICE, for defendant.

This matter is before the Court on the motion of plaintiff Consumer Data Industry Association ("CDIA") for a temporary restraining order. The Court heard argument on July 30, 2007, after CDIA filed both an opening and a reply brief and Swanson filed an opposition brief. For the reasons that follow, the Court treats CDIA's motion as a motion for a preliminary injunction and grants the motion.

I. BACKGROUND

Credit reporting is big business. Credit bureaus (also known as "credit reporting agencies" and "consumer reporting agencies") such as Equifax, Experian, and TransUnion collect information about consumers' credit experience and resell that information for various purposes. Congress enacted the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681-1681x, to govern the resale by credit bureaus of credit-related information about consumers.

As anyone with a mailbox knows, lenders are always looking for new customers. To identify prospective customers, lenders sometimes purchase from credit bureaus lists of "prescreened" consumers. For example, a lender may ask a credit bureau to generate a list of all consumers who have a credit score exceeding a certain number and who live in a certain ZIP code. *See* Finneran Decl. ¶ 3 [Docket No. 7]; Goerss Decl. ¶ 3 [Docket No. 8]; McCawley Decl. ¶ 3 [Docket No. 9]. Under the FCRA, a lender is permitted to buy — and a credit bureau is permitted to sell — such a prescreened list under certain circumstances. *See* 15 U.S.C. § 1681b. In the past several years, mortgage lenders have become more active in using prescreened lists to market their services to consumers. *See* Vasaly Decl. Exs. A-B [Docket No. 17].

This case involves the use by lenders of so-called mortgage-trigger lists. When a consumer applies for a mortgage with a particular lender, that lender requests the consumer's credit report from one or more credit bureaus. The lender's request shows up in the consumer's credit report as an "inquiry" made by that lender. Competing mortgage lenders are naturally interested in marketing their services to consumers who are actively shopping for a mortgage. Credit bureaus have thus begun to sell lists of consumers whose credit reports reflect a recent inquiry from a mortgage lender. In effect, the inquiry by the mortgage lender with whom the consumer has applied for a mortgage "triggers" the placement of that consumer's name on a list (a "mortgage-trigger" list) that is then sold to competing mortgage lenders. *See* Finneran Decl. ¶ 4; Goerss Decl. ¶ 4; McCawley Decl. ¶ 4.

In May 2007, the Minnesota legislature passed a bill to amend Minnesota Statutes § 13C.01 by adding subdivision 3, which forbids the sale of mortgage-trigger lists. *See* 2007 Minn. Sess. Law Serv. Ch. 105 (West). Subdivision 3 of Minnesota Statutes § 13C.01 is

scheduled to take effect on August 1, 2007.  CDIA moves for a temporary restraining order forbidding the Minnesota Attorney General, defendant Lori Swanson, to enforce subdivision 3 of § 13C.01.  CDIA argues that the Minnesota law is preempted by the FCRA.  Pl. Mem. Supp. App. TRO at 15-17 ("Pl. TRO Mem.") [Docket No. 4].  CDIA also argues that the Minnesota law is unconstitutional because it violates the rights of CDIA members to free speech under the First Amendment.  *Id.* at 17-19.

## II.  DISCUSSION

In deciding whether to grant preliminary equitable relief, such as a temporary restraining order or a preliminary injunction, this Court must consider four things:

1. The threat of irreparable harm to the movant if relief is denied;

2. The relative harm that the movant will suffer if relief is denied versus the harm that the non-moving party will suffer if relief is granted.

3. The movant's likelihood of success on the merits.  And

4. The public interest.

*See Dataphase Sys., Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).  Temporary restraining orders are governed by Rule 65(b) of the Federal Rules of Civil Procedure, while preliminary injunctions are governed by Rule 65(a).

CDIA argues that because it seeks only a temporary restraining order, the Court need not apply the four *Dataphase* factors "with the same degree of scrutiny" that would be called for if CDIA were moving for a preliminary injunction.  Pl. TRO Mem. at 8.  Both CDIA and Swanson, however, have fully briefed the applicability of all four factors.  Moreover, as a leading treatise notes, "a 'temporary restraining order' that is granted after notice and a hearing . . . typically will

be treated as a preliminary injunction and will be appealable." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2962 (2d ed. 1995).

Although the briefing and hearing schedule in this case has been accelerated, the relevant issues have been very well briefed and argued by each side's able counsel. Swanson concedes that the key issue in this case is the likelihood that CDIA will succeed on the merits. Def. Mem. Opp. Mot. TRO at 4 ("Def. TRO Opp.") [Docket No. 16]. The Court needs no further facts and no additional briefing to determine whether CDIA is, in fact, likely to succeed on the merits. For that reason, and with the consent of the parties, the Court will treat CDIA's motion for a temporary restraining order as a motion for a preliminary injunction.

The challenged Minnesota statute, subdivision 3 of § 13C.01, provides in relevant part:

> A consumer reporting agency . . . may not sell to, or exchange with, a third party, unless the third party holds an existing mortgage loan on the property, the existence of a credit inquiry arising from a consumer mortgage loan application when the sale or exchange is triggered by an inquiry made in response to an application for credit.

2007 Minn. Sess. Law Serv. Ch. 105 (West). While the language, taken literally, is puzzling — how does someone "sell . . . *the existence* of a credit inquiry"? — the statute's meaning is clear enough. Subdivision 3 of § 13C.01 is intended to prohibit credit bureaus from generating a list of consumers who have applied for mortgages — a mortgage-trigger list — and then marketing that list to third parties. In the statute's terms, the sale of such a list would be "triggered by an inquiry made in response to [a consumer's] application for credit," and the list would reveal "the existence of a credit inquiry arising from a consumer mortgage loan application." Minn. Stat. § 13C.01 subd. 3.

CDIA argues that the FCRA's preemption provision renders void Minnesota's attempt, in subdivision 3 of § 13C.01, to prohibit the sale by credit bureaus of mortgage-trigger lists. Pl. TRO Mem. at 15-17. The FCRA's preemption provision, 15 U.S.C. § 1681t, establishes a background rule that state laws are not preempted unless they are inconsistent with the FCRA. This background rule is subject to important exceptions, however. Of particular importance to this case is § 1681t(b), which expressly preempts certain state laws by providing that:

> No requirement or prohibition may be imposed under the laws of any State —
>
> > (1) with respect to any subject matter regulated under —
> >
> > > (A) subsection (c) . . . of section 1681b of this title, relating to the prescreening of consumer reports[.]

15 U.S.C. § 1681t(b). Accordingly, if the challenged Minnesota statute imposes a "requirement or prohibition . . . with respect to any subject matter regulated under [§ 1681b(c)]," then the FCRA expressly preempts it.[1] We turn, then, to § 1681b(c).

Section 1681b(c) governs "[f]urnishing reports in connection with credit or insurance transactions that are not initiated by [a] consumer." Both parties agree that this is a reference to prescreened reports. Under § 1681b(c)(1), a credit bureau "may furnish a consumer report relating to any consumer . . . in connection with any credit or insurance transaction that is not initiated by the consumer" — that is, furnish a prescreened list on which a consumer's name appears — without the consumer's authorization only if three conditions are met: (1) "the transaction consists of a firm offer of credit or insurance," § 1681b(c)(1)(B)(i); (2) the credit

---

[1] Because this case involves express preemption under the FCRA, the Court need not consider field or conflict preemption, both of which are types of implied preemption. *See generally N. Natural Gas Co. v. Iowa Utils. Bd.*, 377 F.3d 817, 820-21 (8th Cir. 2004) (discussing different types of federal preemption).

bureau has complied with the FCRA's provisions governing the ability of consumers to opt out of receiving unsolicited firm offers of credit or insurance, § 1681b(c)(1)(B)(ii); and (3) the consumer has not, in fact, opted out of receiving such unsolicited firm offers, § 1681b(c)(1)(B)(iii).  In sum, § 1681b(c)(1) gives credit bureaus the right to provide a prescreened list of consumers (i.e., "consumer report[s]") to lenders (and insurers) that commit to make firm offers to consumers on the list.[2]

CDIA argues that mortgage-trigger lists provided by credit bureaus to mortgage lenders are "consumer reports" within the meaning of § 1681b(c).  Pl. Reply. Mem. at 2 [Docket No. 23] ("The so-called 'trigger leads' are a type of prescreened consumer report.").  In other words, in CDIA's view, mortgage-trigger lists are simply one example of the prescreened reports that are explicitly authorized by § 1681b(c)(1).  Just as § 1681b(c)(1) permits a credit bureau to sell lists of consumers screened by credit score or location of residence, so, too, does § 1681b(c)(1) permit a credit bureau to sell lists of consumers who have recently applied for mortgages.  If CDIA is correct, then § 1681t(b)(1)(A) clearly preempts subdivision 3 of Minnesota Statutes § 13C.01, which purports to prohibit credit bureaus from selling mortgage-trigger lists, i.e., from selling a type of "consumer report."

In response, Swanson argues that Minnesota can regulate mortgage-trigger lists because they are removed from the category of "credit reports" that may be sold under § 1681b(c)(1) by another subsection of § 1681b — § 1681b(c)(3).  That subsection provides: "[A] consumer reporting agency shall not furnish to any person a record of inquiries in connection with a credit

---

[2]Section 1681b(c)(2) also limits the permissible content of consumer reports provided under § 1681b(c)(1).

or insurance transaction that is not initiated by a consumer." According to Swanson, when a credit bureau furnishes a mortgage-trigger list to a lender, the credit bureau violates § 1681b(c)(3) by "furnish[ing]" that lender "a record of inquiries in connection with a credit or insurance transaction that is not initiated by a consumer." Swanson concludes that the Minnesota statute is not preempted because it forbids something — selling mortgage-trigger lists — that is already forbidden under the FCRA. Def. TRO Opp. at 9 ("Since a trigger lead is unauthorized, it should not be deemed a prescreened report that is completely insulated from state legislation by FCRA's specific preemption language. If a trigger lead is not a prescreened report, it is not protected by FCRA's specific preemption language.").[3]

Swanson's argument is self-defeating. Even if mortgage-trigger lists are indeed forbidden by the FCRA because they reflect "a record of inquiries" — a question on which this Court expresses no opinion — Minnesota still may not regulate them for the *very reason* that they are forbidden by § 1681b(c)(3). The preemptive reach of the FCRA is both broad and explicit: Section 1681t(b)(1)(A) preempts any state law that imposes a prohibition or requirement with respect to "any *subject matter* regulated by" § 1681b(c). Whether selling mortgage-trigger lists is explicitly authorized by § 1681b(c)(1) (as CDIA argues) or explicitly forbidden by § 1681b(c)(3) (as Swanson argues), the "subject matter" of mortage-trigger lists is

---

[3]Swanson also argues that at least some of the lenders who purchase mortgage-trigger lists do not then make "firm offers" of credit to consumers. Def. TRO Opp. at 9 ("[A] telemarketer cannot meaningfully make a 'firm offer' to a consumer to enter into a transaction as complex as a mortgage loan . . . over the telephone."). Swanson may be right — but that would not give Minnesota the right under the FCRA to regulate mortgage-trigger lists. It would simply mean that those lenders — and perhaps the credit bureaus that sell mortgage-trigger lists to them — could be held liable under federal law for violating the FCRA. *See* 15 U.S.C. § 1681n-1681o (governing civil liability for noncompliance with the FCRA).

unquestionably regulated by § 1681b(c), and thus, under § 1681t(b)(1)(A), neither Minnesota nor any other state may prohibit or regulate their sale.

The Court therefore finds that CDIA has a very strong likelihood of prevailing on the merits of its argument that subdivision 3 of § 13C.01 is preempted by the FCRA.  In light of Swanson's concession that CDIA's likelihood of success on the merits is the key issue at this stage in the case, the Court addresses only briefly the other three preliminary-injunction factors.

The Court finds that CDIA members are likely to suffer irreparable harm, in the form of non-compensable monetary losses, unless the court enjoins enforcement of subdivision 3 of § 13C.01.  If the statute took effect, CDIA members would lose considerable sales and incur considerable administrative costs, and CDIA members would be unable to recover damages from the State of Minnesota because of the Eleventh Amendment.  As to the balance of harms between the parties, the Court finds that this factor favors neither party.  CDIA members will likely lose money if the Court denies its motion and Swanson enforces subdivision 3 of § 13C.01.  But the Minnesota legislature enacted subdivision 3 of § 13C.01 because it believed that the public needed to be protected from aggressive marketing tactics of mortgage lenders using mortgage-trigger lists.  If the public would indeed benefit from the protections of subdivision 3 of § 13C.01, then Swanson, in her role as Attorney General, will be harmed because she will not be able to protect Minnesotans under the statute.

The public interest is also neutral.  On the one hand, perhaps Minnesotans would benefit from enforcement of subdivision 3 of § 13C.01.  On the other hand, Minnesotans have an interest, as citizens of the United States, in seeing federal statutes enforced.  And while the state legislature apparently thought that forbidding the sale of mortgage-trigger lists would be in the

public interest, Congress thought that the public interest would be better served by preventing states from regulating in this area, thereby ensuring uniform national regulation of the sale and use of credit reports.  It appears that Congress and the Minnesota legislature have different views about how best to regulate the activity of credit bureaus.  By virtue of the Supremacy Clause of the United States Constitution, U.S. Const. Art. IV, cl. 2, and the FCRA's express-preemption provision, 15 U.S.C. § 1681t, Congress's views on the subject must prevail.

In light of the Court's analysis of preemption under the FCRA, the Court declines to reach CDIA's First Amendment argument.  *See, e.g.*, *United States v. Turechek*, 138 F.3d 1226, 1229 (8th Cir. 1998) ("While federal courts are obliged to decide constitutional questions when necessary to resolution of the dispute before them, 'they have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of parties to case under consideration.'") (quoting *County Ct. v. Allen*, 442 U.S. 140, 154 (1979)).  Also, as both parties have conceded that a bond is not necessary, the Court declines to order CDIA to give security under Fed. R. Civ. P. 65(c).

## ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, plaintiff's motion for a temporary restraining order [Docket No. 2] is construed as a motion for a preliminary injunction and is GRANTED.  Accordingly, IT IS HEREBY ORDERED THAT defendant Lori Swanson, in her capacity as the Attorney General of the State of Minnesota, is PRELIMINARILY ENJOINED from enforcing, directly or indirectly, subdivision 3 of Minnesota Statutes § 13C.01.  This injunction will remain in force until this case has been fully and finally adjudicated on the merits.

Dated:  July 30, 2007                              s/Patrick J. Schiltz                                     
                                                             Patrick J. Schiltz
                                                             United States District Judge